IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

OWNERS INSURANCE COMPANY,

     Plaintiff,

v.

TIDEWATER FLEET SUPPLY, LLC;
PARTS SOUTH OF GEORGIA, INC.;
JASON L. McCARD; EDWIN DALE
ADAMS; RUSSELL K. PERRY; and
JOSEPH R. VEITCH,

     Defendants.

Civil Action File
No.: _____

## COMPLAINT FOR DECLARATORY JUDGMENT

COMES NOW OWNERS INSURANCE COMPANY (hereinafter

"Owners") and files its Complaint for Declaratory Judgment, showing this

Honorable Court as follows:

## THE PARTIES

1.

Owners is a corporation organized and existing under the laws of the state of

Ohio with its principal place of business in Michigan.

2.

Tidewater Fleet Supply, LLC ("TFS") is a foreign limited liability company organized and existing under the laws of Virginia with its principal place of business located in Virginia.  TFS's members are Blake J. Casper, Brandon Herrin, Gregory R. Woods, L. Allan Parrott, Jr., and William A. Krusen, III.  All of these members of TFS are domiciled in the state of Virginia. TFS maintains a registered agent in Georgia and may be served with summons and process at Capitol Corporate Services, Inc., 3675 Crestwood Parkway NW, Suite 350, Duluth, Georgia, 30096.

3.

Parts South of Georgia, Inc. ("PSG") is a domestic for-profit corporation organized and existing under the laws of the state of Georgia with its principal place of business and citizenship in Georgia. PSG has its principal place of business located at 4145 Bonsal Road, Conley, Georgia, 30288 and may be served through its registered agent, Joseph R. Veitch, at 4145 Bonsal Road, Conley, Georgia, 30288. PSG is subject to the jurisdiction and venue of this Court.

4.

Defendant Jason L. McCard ("McCard") is a citizen and domiciliary of the state of Georgia. Service may be perfected upon him at 340 Sturgess's Run, Sharpsburg, Georgia 30277.

5.

Defendant Edwin Dale Adams ("Adams") is a citizen and domiciliary of the state of Georgia. Service may be perfected upon him at 175 Arrowhead Trail, Eatonton, Georgia 31024.

6.

Defendant Russell K. Perry ("Perry") is a citizen and domiciliary of the state of Georgia. Service may be perfected upon him at 140 Swan Lake Drive, Stockbridge, Georgia 30281.

7.

Defendant Joseph R. Veitch ("Veitch") is a citizen and domiciliary of the state of Georgia. Service may be perfected upon him at 4145 Bonsal Road, Conley, Georgia, 30288.

## JURISDICTION AND VENUE

8.

This Court has original jurisdiction over this action under the provisions of 28 U.S.C. § 1332 because this action is between citizens of different states and the amount in controversy exceeds the sum of $75,000, exclusive of interest and costs.

9.

Venue is proper in this Court pursuant to 28 U.S.C. § 1391.

## NATURE OF ACTION

10.

This is an action for declaratory judgment brought pursuant to Rule 57 of the Federal Rules of Civil Procedure and 28 U.S.C. § 2201, to declare the rights and other legal relations surrounding questions of actual controversy that presently exist between Owners and Defendants.

11.

A controversy of a judicial nature presently exists among the parties, which demands a declaration by this Court in order that Owners may have its rights and duties under certain contracts of insurance determined and avoid the possible accrual of damages.

## THE UNDERLYING LAWSUIT

### 12.

On May 15, 2020, TFS filed a lawsuit in the State Court of Fulton County, Georgia against McCard, Adams, Perry, Veitch, and PSG, the same being designated as Civil Action File No. 20EV002797 ("Underlying Lawsuit"). A true and accurate copy of the complaint filed in the Underlying Lawsuit is attached hereto as **Exhibit A.**

### 13.

On or about September 17, 2020, TFS filed a First Amended Complaint in the Underlying Lawsuit. A true and accurate copy of the First Amended Complaint filed in the Underlying Lawsuit is attached hereto as **Exhibit B.**

### 14.

In the First Amended Complaint filed in the Underlying Lawsuit, TFS alleged that McCard, Adams, and Perry knowingly conspired with Veitch to implement a scheme to unfairly compete with TFS by: (i) sabotaging TFS' business operations; (ii) surreptitiously preparing to divert and then soliciting TFS customer and supplier business that was developed using TFS' resources; and, (iii) soliciting other TFS employees, who they had helped demoralize, to fill PSG's

roster across all job functions in PSG offices in Atlanta, Georgia and Charlotte, North Carolina, which then launched complete operations and began diverting customers and business from TFS more quickly than they otherwise would have had PSG not established its branches by filling its ranks with former TFS employees who targeted their former TFS customers and used information they had accessed and obtained from TFS.

15.

The First Amended Complaint filed in the Underlying Lawsuit also asserted the following causes of action: Count I – Breach of Fiduciary Duty/Faithless Servant; Count II – Aiding and Abetting Breach of Fiduciary Duty; Count III – Tortious Interference with Existing and Prospective Business Relations; Count IV – Raiding TFS' Employees; Count V – Business Disparagement; Count VI – North Carolina Unfair and Deceptive Trade Practices Act; and, Count VIII – Civil Conspiracy.

16.

According to the allegations of the complaints filed in the Underlying Lawsuit:

a.      TFS's predecessor, TNT Parts, Inc. ("TNT") was founded in 2000. From its principal branch in Atlanta, as well as additional branches in Georgia,

North Carolina, South Carolina, and Florida, the company operates as a wholesaler and distributor of heavy-duty truck and trailer parts to transportation and freight companies, municipalities, and repair shops.

       b.      McCard, Adams, Perry, and Veitch worked together for several years at TNT's Atlanta branch.

       c.      Perry and Veitch were inside salesmen.

       d.      McCard was the Southeast division operations manager based out of the Atlanta branch, which accounted for about fifty (50) percent of the approximately thirty (30) million dollars in system-wide TNT sales. McCard's responsibilities included oversight and frequent interaction with TNT Charlotte, North Carolina branch, including: its branch manager Crystal Roseberry ("Roseberry"); inside sales employees Ronny "Joe" Caldwell ("Caldwell") and Breanna Lautzenheiser ("Breanna"); and warehouse manager Bradley Lautzenheiser ("Bradley") (hereinafter Roseberry, Caldwell, Breanna, and Bradley will be collectively referred to as "Former Charlotte Employees").

       e.      Adams served as the Atlanta branch manager and was also responsible for the Atlanta distribution center. The Atlanta distribution center maintained and handled approximately six (6) million dollars of inventory for distribution to TFS's five (5) other branches. In his role overseeing the Atlanta distribution center,

Adams was responsible for fulfillment, parts availability, timing, and related matters. Adams also served as the primary interface with purchasing and receiving. He also oversaw all of the routes and dispatch for the Atlanta market.

f.    During their time as employees at TNT, McCard, Adams, Perry, and Veitch developed professional and personal relationships. McCard, Adams, Perry, and Veitch also developed such relationships with the Former Charlotte Employees.

g.    In February of 2016, TFS (a full line truck, trailer, municipal, and heavy equipment parts distributor) acquired TNT ("Acquisition").

h.    After the Acquisition, TNT became a wholly owned subsidiary of TFS and continued to do business under the trade name "TNT Parts."

i.    TFS has become one of the largest independent parts distributors on the east coast specializing in fleet parts and supplies, with over two hundred (200) employees at fourteen (14) locations stretching from Richmond, Virginia to Jacksonville, Florida with annual sales exceeding sixty-two (62) million dollars at their peak.

j.    After the acquisition, McCard, Adams, Perry, and the Former Charlotte Employees continued to work for TNT.

k.      In or about April 2018, TNT was merged into TFS, which became the surviving entity (the "Merger").

l.      In or about late 2007, Veitch resigned from TNT.

m.      In or about early 2009, Veitch opened Complete Parts, Inc. ("CPI") in the Atlanta area.

n.      CPI specialized in chassis repair for intermodal trailers. As such, CPI competed with one segment of TNT's business.

o.      In or about early 2014, Veitch incorporated CPI Enterprises, Inc. and began to operate CPI's business under that name (hereinafter CPI and CPI Enterprises, Inc., will be collectively referred to as "CPI").

p.      Up until 2016, TNT and CPI operated as "friendly" competitors with sizeable overlap, and CPI would sometimes purchase intermodal parts from TNT as a customer.

q.      In or about mid-2016, the harmonious co-existence between TNT and CPI broke down when CPI hired one of TNT's inside sales employees who specialized in intermodal parts. After that event, TNT stopped doing business with CPI.

r.      In or about April 2018, Veitch hired another employee from TFS. This individual worked in outside sales and had broad and deep customer relationships that encompassed all segments of TFS' business.

s.      Because CPI specialized in intermodal parts and services, this development raised a question as to whether, through a raid of TFS' employees, Veitch intended to expand his business, or open a new one, to distribute truck and trailer parts in direct competition with TFS across the entire relevant market.

t.      This continued or new business eventually became PSG.

u.      Between October 2018 and July 2019, Veitch and PSG carried out a calculated and orchestrated attack on TFS' Atlanta branch by hiring an additional eighteen (18) employees from that branch: one (1) in October; four (4) in January; two (2) in February; three (3) in March; two (2) in April; three (3) in May; one (1) in June; and, two (2) in July.

v.      To carry out this raid of employees, Veitch and PSG relied on and encouraged managers and others at TFS, including McCard, Adams, and Perry, to foment unrest and disruption at the company – including sabotaging TFS' business operations – so that the employees would be primed to join their colleagues and Veitch at PSG and TFS would be left struggling to catch up as PSG obtained an unlawful, immediate head-start with its competing business.

- 10 -

w.      McCard, Adams, and Perry sabotaged TFS in this way over many months. No later than June 2018, McCard, Adams, and Perry agreed with Veitch and among themselves that Perry would resign from TFS near the end of 2018, and that McCard and Adams would do so in early 2019 after collecting year-end bonuses, to help Veitch launch PSG and begin competing against TFS.

x.      Veitch and PSG further incentivized McCard and Adams to sabotage TFS while still on its payroll and in charge of running the Atlanta branch, by promising or offering to give them an equity stake in PSG – an award that they have since received.

y.      McCard, Adams, and Perry, as well as other then-employed by TFS, intentionally and willfully engaged in unlawful conduct against TFS while still employed there so that they could later unjustly benefit from it personally after officially joining PSG.

z.      McCard, Adams, and Perry actively worked against TFS' interests and for the benefit of its competitor, PSG, even while receiving the following substantial compensation from TNT and TFS:

1. From the beginning of 2018 through the date of his resignation on October 29, 2018, TFS/TNT paid Perry compensation exceeding $73,000, plus benefits;

- 11 -

2. From 2018 through the date of his resignation on January 18, 2019,

TFS/TNT paid McCard base compensation and a bonus exceeding $143,000,

plus benefits; and

3. From 2018 through the date of his resignation on February 15, 2019,

TFS/TNT paid Adams base compensation and a bonus exceeding $163,000,

plus benefits.

aa.     McCard, Adams, and Perry's misconduct included, but was not

limited to, the following:

1. Perry, who worked in TFS' inside sales department and submitted his

resignation on October 29, 2018, in order to join PSG, purged and deleted

his TFS emails (inbox, sent items, deleted items) before leaving the

company;

2. McCard, who was the operations manager of TFS' Atlanta branch,

purged and deleted his TFS emails (inbox, sent items, and deleted items) in

connection with resigning his employment with TFS on January 18, 2019, to

join PSG;

3. McCard intentionally allowed TFS/ certification from the Department of

Transportation to lapse, which was something he was responsible for

renewing every two (2) years and was a process that would typically begin

six (6) months before the expiration date, so that TFS' fleet of trucks would be grounded and the company would have to scramble to rectify the situation over a period of months after he resigned his employment;

4. McCard intentionally stirred unrest by TFS employees against the TFS owners based in Norfolk, Virginia by blaming them for imposing inefficient business operations in the Atlanta branch, when it was actually McCard who had done so or who otherwise failed to help lift morale and implement more appropriate business practices to quell the employees' frustrations;

5. McCard told TFS employees in various branches that they had to defer purchasing any necessary replacement vehicles for transporting customer orders until 2019 because that was the year for which such purchases had been included in the budget he submitted, when, in actuality, McCard knew that the 2019 budget did not include those expenses (and which had the further result of artificially inflating his year-end bonus);

6. McCard informed TFS employees who complained about a cumbersome process for stock ordering that the process was necessary based upon instructions from the owners in Norfolk, Virginia, when, in actuality, McCard knew that this was not the case and the process easily could have been switched to an easier one that new management in Atlanta

implemented shortly after McCard resigned;

7. Adams allowed customer payments for warranty items and returns to pile up, despite having received vendor authorization to process them, to cause further disruption at TFS in anticipation of leaving and to impair TFS' customer relationships and goodwill;

8. Adams persistently sowed internal seeds of discontent about a supposed "lack of inventory" and told customers that TFS was going out of business, despite his knowledge that TFS had millions of dollars of inventory available during all relevant times and a fully staffed purchasing department;

9. McCard and Adams, over the objections of others at TFS re-assigned Perry, in or about July 2018, from an inside sales role to an outside sales role where he would have opportunity to directly interact with a wide array of TFS customers in anticipation of McCard, Adams, and Perry's planned resignations down the road;

10. McCard told other TFS employees "in confidence" that he would be resigning at the beginning of 2019 to work for Veitch and a competing enterprise and secretly solicited them to join him;

11. Before resigning from TFS, McCard, Adams, and Perry told TFS customers and suppliers – including TNT's top supplier and other Tier 1

suppliers – that they and others would be resigning from TFS to work with Veitch at a competing enterprise and solicited those customers and suppliers to later do business with them at the new venture that became PSG; and

12. The cell phone records of Adams, who was the branch manager of TFS' Atlanta branch before submitting his resignation on February 15, 2019, to join PSG, show that, as part of competing with his then-employer TFS on behalf of PSG, he had been communicating with PSG's buying group – which competed with TFS' buying group – before resigning from TFS, and that Veitch had put the two parties in touch so that PSG could launch its operations more quickly using Adams' help.

bb.    McCard, Adams, and Perry met up with each other and Veitch during and after business hours to work for PSG while still employed by TFS.

cc.    Specifically, McCard lied to TFS about his whereabouts during business hours by purporting to call out sick or claiming he had appointments that were personal or on behalf of TFS when, in actuality, he was working with Veitch and/or Adams/Perry to get PSG up and running, including setting up programs with TFS' Tier 1 suppliers that PSG was able to launch from "day 1" only because of the assistance it encouraged and received from McCard, Adams, and Perry while they were on TFS' payroll.

- 15 -

dd.    McCard and Adams also gave their subordinates and other colleagues at TFS permission and encouraged them during hours they were being paid to work for TFS to meet with Veitch off site in order to discuss with Veitch offers to work at PSG and other matters in furtherance of PSG's business activities.

ee.    After Perry resigned from TFS in October 2018 to join forces with Veitch at PSG, he came to TFS' Atlanta branch, or sent a truck there, to retrieve parts that PSG had purchased form TFS so that it could use them for its competing business. Loyal TFS employees objected to these sales to a competitor who had actively recruited and hired away TFS employees, but Adams – knowing that he, too, would soon be joining PSG – overruled those objections and, contrary to previous practice, approved the sales.

ff.    McCard, Adams, and Perry worked together to conceal all of their misconduct from TFS' owners in Norfolk, Virginia.

gg.    After McCard, Adams, and Perry resigned from TFS, they continued their campaign of misconduct against TFS by disparaging and defaming the company in order to divert its clients and suppliers and to win over additional employees. Specifically, McCard, Adams, and Perry falsely told TFS' customers, suppliers, and remaining employees that TFS was going out of business and/or had been acquired by Veitch.

hh.     In addition, McCard, Adams, and Perry and other former TFS employees used, disclosed, and otherwise misappropriated confidential information they had obtained from TFS about its pricing, margins, and customer purchasing history, to siphon off and divert TFS customers to PSG by strategically undercutting TFS' prices.

ii.     McCard, Adams, Perry, Veitch, and PSG engaged in the foregoing conduct to cause TFS significant damages so that its owners would be compelled to either sell the business to McCard, Adams, Perry, and Veitch for pennies on the dollar or, barring that, to shut its doors. Indeed, in or about late January or early February 2019, Adams conveyed that very threat to one of TFS' owners when demanding that he sell out.

jj.     TFS' Atlanta branch has lost millions of dollars in customer revenue, in addition to incurring other damages, as a result of McCard, Adams, Perry, Veitch, and PSG's conduct.

kk.     In 2020, as part of their scheme to obtain an unfair competitive advantage against TFS and cripple its operations, McCard, Adams, Perry, Veitch, and PSG implemented their long-established plan to raid TFS's Charlotte's office.

ll.     On or about July 17, 2020, PSG registered with the North Carolina Secretary of State to conduct business in North Carolina as a foreign corporation

with an office in Charlotte and headquarters in Atlanta, Georgia.

mm.    PSG initially listed Parker Poe Adams & Bernstein as its registered agent for PSG's North Carolina operations.

nn.    At or around this same time, PSG obtained commercial office or warehouse space in the same business park as TFS' Charlotte branch.

oo.    During 2020, McCard, Adams, Perry, Veitch, and PSG carried out a calculated and orchestrated attack on TFS' Charlotte branch by hiring all of its key employees form that branch, each of whom resigned, effective immediately, within a twelve (12) day period without giving TFS any prior notice.

pp.    Specifically, on August 24, 2020, Caldwell, who had served as the branch manager of TFS' Charlotte office before Roseberry assumed that role, submitted his resignation to Roseberry and falsely told TFS that he was going to retire and spend more time with his grandchildren. In fact, Caldwell has gone to work for PSG in Charlotte and is now listed as its registered agent in North Carolina.

qq.    The next day, TFS sent its operations manager to the Charlotte branch to assess the situation and determine whether any other employees in the Charlotte branch had known about Caldwell's plans beforehand, whether they knew if he intended to work for PSG, and whether they intended to stay with TFS.

rr.    Two days later, Bradley submitted his resignation to Roseberry and falsely told TFS employees that he was going to become a professional gamer and had lined up sponsors for that endeavor. He too, however, has joined PSG in Charlotte.

ss.    On the evening of September 3, 2020, Roseberry submitted her resignation to TFS, followed the next day by Breanna. They, too, have since joined PSG in Charlotte.

tt.    Each of the former Charlotte employees falsely told TFS that they did not know about any of the other former Charlotte employees' plans to resign beforehand or about their post-resignation plans to join PSG.

uu.    To carry out this raid of employees in TFS' Charlotte office, McCard, Adams, Perry, Veitch, and PSG relied on and encouraged the former Charlotte employees and others at TFS, to foment unrest and disruption at the company – including through sabotaging TFS' business operations in Charlotte – so that the employees would be primed to join their colleagues at PSG and TFS would be left struggling to catch up as PSG obtained an unlawful, immediate head-start with its competing business in Charlotte.

vv.    Indeed, in an effort to steady the Charlotte branch's operations and contain the damage post-raid, TFS had to send its Atlanta branch manager to work

in the Charlotte branch for approximately two (2) weeks, while TFS' head of sales had to devote unscheduled time to visit that branch's customers and suppliers. TFS discovered that the former Charlotte employees had left inventory and invoicing matters at the branch in a state of disarray.

ww.   The former Charlotte employees, with McCard, Adams, Perry, Veitch, and PSG's knowledge, direction, encouragement and assistance, intentionally and willfully engaged in unlawful conduct against TFS while still employed there so that they could later unjustly benefit from it personally after the former Charlotte employees officially joined PSG.

xx.   The former Charlotte employees did not, however, limit their unlawful conduct to inside maneuvers aimed at hobbling TFS from being able to compete fairly against PSG. Rather, with McCard, Adams, Perry, Veitch, and PSG's knowledge, direction, encouragement and assistance, they also met up with each other and Defendants during and after business hours to work for PSG and further its business activities and interests while still employed by TFS.

yy.   The former Charlotte employees worked together to conceal all of their misconduct from TFS' owners in Norfolk, Virginia and from other TFS employees.

zz.    After the former Charlotte employees resigned from TFS, they continued their campaign of misconduct against TFS, with McCard, Adams, Perry, Veitch, and PSG's knowledge, direction, encouragement and assistance, by disparaging and defaming the company in order to divert its clients and suppliers and to win over additional employees.

aaa.    The former Charlotte employees, with McCard, Adams, Perry, Veitch, and PSG's knowledge, direction, encouragement and assistance, also used, disclosed, and otherwise misappropriated confidential information they had obtained from TFS about its pricing, margins, and customer purchasing history, to siphon off and divert TFS customers to PSG by strategically undercutting TFS' prices.

bbb.    McCard, Adams, Perry, Veitch, and PSG engaged in the foregoing conduct to cause TFS significant damage and gain an unfair head start in its competition with TFS in the Charlotte market.

ccc.    In the upcoming days and months, McCard, Adams, Perry, Veitch, and PSG intend to continue these dealings by raiding TFS' Charlotte branch of its remaining employees.

ddd.   TFS' Charlotte branch has lost and continues to lose customer revenue, in addition to incurring other damages, as a result of McCard, Adams, Perry, Veitch, and PSG's unlawful conduct.

## THE INSURANCE CONTRACTS

17.

Beginning on April 8, 2015, Owners issued a liability insurance policy to Complete Parts, Inc., policy number 154618-80037226-15. This policy was renewed each year consecutively through April 8, 2019 and the renewed policies provided identical coverage. The initial and renewed policies shall hereinafter be collectively referred to as "Policy I." A true and complete copy of Policy I is attached hereto as **Exhibit C.**

18.

Policy I provides, in relevant part:

### COMMERCIAL GENERAL LIABILITY COVERAGE FORM

Various provisions in this policy restrict coverage. Read the entire policy carefully to determine rights, duties and what is and is not covered.

…

Other words and phrases that appear in quotation marks have special meaning. Refer to Section V – Definitions.

- 22 -

**SECTION I – COVERAGES**

**COVERAGE A. BODILY INJURY AND PROPERTY DAMAGE LIABILITY**

1. **Insuring Agreement**

   a.   We will pay those sums that the insured be-comes legally obligated to pay as damages because of "bodily injury" or "property damage" to which this insurance applies.

   …

   b.   This insurance applies to "bodily injury" and "property damage" only if:

       (1)   The "bodily injury" or "property damage" is caused by an "occurrence" that takes place in the "coverage territory";

   …

2. **Exclusions**

   This insurance does not apply to:

   a.   "Bodily injury" or "property damage" expected or intended from the standpoint of the insured. This exclusion does not apply to "bodily injury" resulting from the use of reasonable force to protect persons or property.

   …

## COVERAGE B. PERSONAL INJURY AND ADVERTISING INJURY LIABILITY

**1.     Insuring Agreement**

> **a.**     We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal injury" or "advertising injury" to which this insurance applies.

…

**2.     Exclusions**

This insurance does not apply to "personal injury" or "advertising injury":

> **a.     Knowing Violation Of Rights Of Another Or Expected Or Intended Injury**
>
> > **(1)**     Caused by or at the direction of any insured with the knowledge that the act would violate the rights of another and would inflict "personal injury" or "advertising injury"; or
> >
> > **(2)**     Expected or intended by any insured. This exclusion **a.(2)**, does not apply to "personal injury".
>
> **b.     Material Published With Knowledge Of Falsity**
>
> Arising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity.

- 24 -

…

## SECTION II – WHO IS AN INSURED

1.      If you are designated in the Declarations as:

…

      **d.**      An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

…

2.      Each of the following is also an insured:

      **a.**      Your "employees", other than either your "executive officers" (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business, or your "volunteer workers" only while performing duties related to the conduct of your business.

…

## SECTION V – DEFINITIONS

…

**2.**     "Advertising injury" means injury arising out of one or more of the following offenses:

    **a.**     Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services in your "advertisement";

    **b.**     Oral or written publication, in any manner, of material that violates a person's right of privacy in your "advertisement";

    **c.**     The use of another's advertising idea in your "advertisement"; or

    **d.**     Infringing upon another's copyright, "trade dress" or slogan in your "advertisement".

…

**4.**     "Bodily injury" means bodily injury, bodily sickness or bodily disease sustained by a person, including death resulting from any of these at any time.

…

**14.**     "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

- 26 -

**15.** "Personal injury" means other than "bodily injury" arising out of one or more of the following offenses:

    **a.**    False arrest, detention, or imprisonment;

    **b.**    Malicious prosecution;

    **c.**    The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

    **d.**    Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

    **e.**    Oral or written publication, in any manner, of material that violates a person's right of privacy.

…

**18.** "Property damage" means:

    **a.**    Physical injury to tangible property, including all resulting loss of use of that property. All such loss of used shall be deemed to occur at the time of the physical injury that caused it; or

    **b.**    Loss of use of tangible property that is not physically injured. All such loss shall be deemed to occur at the time of the "occurrence" that caused it.

For the purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

See Commercial General Liability Coverage Form, 55300 (7-05), pp. 1-2, 6-7, 14, 16-17 of 18.

19.

Policy I also provides, in relevant part

**COMMERCIAL GENERAL LIABILITY PLUS ENDORSEMENT**

…

**4.   PERSONAL INJURY EXTENSION**

**a.**   If the endorsement EXCLUSION-PERSONAL INJURY AND ADVERTISING INJURY, 55350, is attached to this policy, then this provision, 4. PERSONAL INJURY EXTENSION, does not apply.

**b.**   If the endorsement EXCLUSION – PERSONAL INJURY AND ADVERTISING INJURY, 55350, is not attached to this policy, then under **SECTION V – DEFINITIONS**, **15.** "Personal injury" is deleted and replaced by the following:

- 28 -

**15.**   "Personal injury" means, other than "bodily injury", arising out of one or more of the following offenses:

    **a.**   False arrest, detention or imprisonment;

    **b.**   Malicious prosecution;

    **c.**   The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies by or on behalf of its owner, landlord or lessor;

    **d.**   Oral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services;

    **e.**   Oral or written publication of material that violates a person's right of privacy;

    **f.**   Discrimination, humiliation, sexual harassment and any violation of civil rights caused by such discrimination, humiliation or sexual harassment.

<u>See</u> Commercial General Liability Coverage Form, 55352 (10-08), pp. 1-2 of 4.

20.

Owners then issued a policy to PSG, policy number 154618-80037226-19,

with an effective policy period of April 8, 2019 through April 8, 2020 ("Policy

II"). A true and complete certified copy of the Policy is attached hereto as **Exhibit D.**

21.

Policy II provides, in relevant part:

## COMMERCIAL LIABILITY PLUS COVERAGE

This endorsement modifies insurance provided under the following:

…

**4. PERSONAL INJURY EXTENSION**

    **a.** If the endorsement EXCLUSION-PERSONAL AND ADVERTISING INJURY, CG 21 28 is attached to this policy, then this provision, **4.** PERSONAL INJURY EXTENSION does not apply.

    **b.** If the endorsement EXCLUSION-PERSONAL AND ADVERTISING INJURY, CG 21 28, is not attached to this policy, then **SECTION V – DEFINITIONS** is amended. Paragraph **14.** "Personal and advertising injury" is deleted and replaced by the following definition.

        **14.** "Personal and advertising injury" means injury including consequential "bodily injury", arising out of one or more of the following offenses:

            **a.** False arrest, detention or imprisonment;

            **b.** Malicious prosecution;

- 30 -

**c.**   The wrongful eviction from, wrongful
entry into, or invasion of the right of pri-
vacy occupancy of a room, dwelling or
premises that a person occupies by or
on behalf of its owner, landlord or lessor;

**d.**   Oral or written publication, in any manner,
of material that slanders or libels a
person or organization or disparages a
person's or organization's goods,
products or services;

**e.**   Oral or written publication of material, in
any manner, that violates a person's
right of privacy;

**f.**   The use of another's advertising idea in
your "advertisement";

**g.**   Infringing upon another's copyright,
trade dress or slogan in your
"advertisement"; or

**h.**   Discrimination, humiliation, sexual ha-
rassment and any violation of civil rights
caused by such discrimination, humilia-
tion or sexual harassment.

See Commercial General Liability Coverage Form, 55352 (5-17), pp. 1 of 3.

22.

Policy II also provides, in relevant part:

**COMMERCIAL GENERAL LIABILITY COVERAGE FORM**

Various provisions in this policy restrict coverage. Read
the entire policy carefully to determine rights, duties and
what is and is not covered.

Throughout this policy the words "you" and "your" refer
to the Named Insured shown in the Declarations, and
any other person or organization qualifying as a Named
Insured under this policy. The words "we", "us" and
"our" refer to the company providing this insurance.

The word "insured" means any person or organization
qualifying as such under Section II – Who Is An Insured.
Other words and phrases that appear in quotation marks
have special meaning. Refer to Section V – Definitions.

**SECTION I – COVERAGES**
**COVERAGE A – BODILY INJURY AND PROPERTY**
**DAMAGE LIABILITY**

**1.**     **Insuring Agreement**

   **a.**     We will pay those sums that the insured be-
              comes legally obligated to pay as damages be-
              cause of "bodily injury" or "property damage" to
              which this insurance applies. We will have the
              the right and duty to defend any insured against any
              "suit" seeking those damages. However, we will
              have no duty to defend the insured against any
              "suit" seeking damages for "bodily injury" or
              "property damage" to which this insurance does

- 32 -

not apply. We may, at our discretion, investi-
gate any "occurrence" and settle any claim or
"suit" that may result.

…

**b.**   This insurance applies to "bodily injury" and
**"**property damage" only if:

**(1)**   The "bodily injury" or "property damage" is
caused by an "occurrence" that takes place
in the "coverage territory"

…

**2.**   **Exclusions**

This insurance does not apply to:

**a.**   **Expected or Intended Injury**
"Bodily injury" or "property damage expected or
intended from the standpoint of the insured.
This exclusion does not apply to "bodily injury"
resulting from the use of reasonable force to
protect persons or property.

…

**o.**   **Personal and Advertising Injury**
"Bodily injury" arising out of "personal and ad-
vertising injury".

…

**COVERAGE B – PERSONAL AND ADVERTISING INJURY LIABILITY**

**1.    Insuring Agreement**

    **a.**    We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies.

…

**2.    Exclusions**

This insurance does not apply to:

    **a.**    **Knowing Violation of Rights of Another**
"Personal and advertising injury" caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict "personal and advertising injury".

    **b.**    **Material Published With Knowledge Of Falsity**
"Personal and advertising injury" arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity.

…

**SECTION II – WHO IS AN INSURED**

**1.**     If you are designated in the Declarations as:

…

    **d.**     An organization other than a partnership, joint venture or limited liability company, you are an insured. Your "executive officers" and directors are insureds, but only with respect to their duties as your officers or directors. Your stockholders are also insureds, but only with respect to their liability as stockholders.

…

**2.**     Each of the following is also an insured:

    **a.**     Your "volunteer workers" only while performing duties related to the conduct of your business, or your "employees", other than either your "executive officers (if you are an organization other than a partnership, joint venture or limited liability company) or your managers (if you are a limited liability company), but only for acts within the scope of their employment by you or while performing duties related to the conduct of your business.

…

**SECTION V – DEFINITIONS**

…

**3.** "Bodily injury" means bodily injury, sickness or disease sustained by a person, including death resulting from any of these at any time.

…

**13.** "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions.

**14.** "Personal and advertising injury" means injury, including consequential "bodily injury", arising out of one or more of the following offenses:

    **a.** False arrest, detention or imprisonment;

    **b.** Malicious prosecution;

    **c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

    **d.** Oral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products, or services;

    **e.** Oral or written publication, in any manner, of material that violates a person's right of privacy;

**f.**     The use of another's advertising idea in your "advertisement"; or

**g.**     Infringing upon another's copyright, trade dress or slogan in your "advertisement".

…

**17.**   "Property Damage" means:

**a.**     Physical injury to tangible property, including all resulting loss of use of that property. All such loss of use shall be deemed to occur at the time of the physical injury that caused it; or

**b.**     Loss of use of tangible property that is not physically injured. All such loss of use shall be deemed to occur at the time of the "occurrence" that caused it.

For purposes of this insurance, electronic data is not tangible property.

As used in this definition, electronic data means information, facts or programs stored as or on, created or used on, or transmitted to or from computer software, including systems and applications software, hard or floppy disks, CD-ROMS, tapes, drives, cells, data processing devices or any other media which are used with electronically controlled equipment.

<u>See</u> Commercial General Liability Coverage Form, CG 00 01 04 13, pp. 1-2, 5, 11, 13 of 14.

23.

PSG, McCard, Adams, Perry, and Veitch seek a defense and indemnity under Policy I and Policy II for the claims asserted against them in the Underlying Lawsuit.

24.

However, questions exists as to whether Policy I or Policy II afford any coverage at all for the claims and damages upon which the Underlying Lawsuit is based. Therefore, Owners is uncertain as to whether it has any duty to defend or indemnify PSG, McCard, Adams, Perry, or Veitch in connection with the Underlying Lawsuit.

**RESERVATION OF RIGHTS**

25.

After receiving notice of the Underlying Lawsuit, Owners issued a letter to PSG, McCard, Adams, Perry, and Veitch, wherein Owners provided notice of its reservation of rights to disclaim any obligation under the policies and to assert the defense of non-coverage. A true and accurate copy of the reservation of rights letter is attached hereto as **Exhibit E**.

26.

After receiving notice of the Underlying Lawsuit, Owners retained counsel to defend PSG, McCard, Adams, Perry, and Veitch in the Underlying Lawsuit, subject to the complete reservation of rights.

## COUNT I:
## THE UNDERLYING LAWSUIT DOES NOT SEEK
## DAMAGES FOR DEFINED INJURY

27.

Owners repeats and realleges the foregoing paragraphs as if fully set forth herein.

28.

The Underlying Lawsuit seeks damages related to a conspiracy manufactured by PSG, McCard, Adams, Perry, and Veitch and unfair competition.

29.

Specifically, the Underlying Lawsuit seeks damages related to the conspiracy manufactured by PSG, McCard, Adams, Perry, and Veitch and unfair competition with TFS by (i) sabotaging TFS' business operations; (ii) surreptitiously preparing to divert and then soliciting TFS customer and supplier business that was developed using TFS' resources; and, (iii) soliciting other TFS employees, who they had helped demoralize, to fill PSG's roster across all job

- 39 -

functions in PSG offices in Atlanta, Georgia and Charlotte, North Carolina, which then launched complete operations and began diverting customers and business from TFS more quickly than they otherwise would have had PSG not established its branches by filling its ranks with former TFS employees who targeted their former TFS customers and used information they had accessed and obtained from TFS.

30.

Further, the Underlying Lawsuit asserted the following causes of action: Count I – Breach of Fiduciary Duty/Faithless Servant; Count II – Aiding and Abetting Breach of Fiduciary Duty; Count III – Tortious Interference with Existing and Prospective Business Relations; Count IV – Raiding TFS' Employees; Count V – Business Disparagement; Count VI – North Carolina Unfair and Deceptive Trade Practices Act; and Count VIII – Civil Conspiracy.

31.

The Underlying Lawsuit does not seek damages for "bodily injury", defined by both Policy I and Policy II as "bodily injury, sickness or disease sustained by a person, including death resulting from any of these ay any time."

32.

The Underlying Lawsuit does not seek damages for "property damage", defined by both Policy I and Policy II as "[p]hysical injury to tangible property, including all resulting loss of use of that property" or "[l]oss of use of tangible property that is not physically injured."

33.

Further, both Policy I and Policy II provide that "electronic data is not tangible property."

34.

The Underlying Lawsuit does not seek damages for "personal injury" defined by Policy I as "other than 'bodily injury', arising out of one or more of the following offenses: **a.** [f]alse arrest, detention or imprisonment; **b.** [m]alicious prosecution; **c.** [t]he wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that person occupies by or on behalf of its owner, landlord or lessor; **d.** [o]ral or written publication of material that slanders or libels a person or organization or disparages a person's or organization's good, products or services; **e.** [o]ral or written publication of material that violates a person's right of privacy; **f.** [d]iscrimination, humiliation,

sexual harassment and any violation of civil rights caused by such discrimination,
humiliation or sexual harassment."

35.

The Underlying Lawsuit does not seek damages for "advertising injury"
defined by Policy I as "injury arising out of one or more of the following offenses:
**a.** [o]ral or written publication, in any manner, of material that slanders or libels a
person or organization or disparages a person's or organization's goods, products
or services in your 'advertisement'; **b.** [o]ral or written publication, in any manner,
of material that violates a person's right of privacy in your 'advertisement'; **c.** [t]he
use of another's advertising idea in your "advertisement"; or **d.** [i]nfringing upon
another's copyright, 'trade dress' or slogan in your 'advertisement.'"

36.

The Underlying Lawsuit does not seek damages for "[p]ersonal and
advertising injury" defined by Policy II as "injury including consequential 'bodily
injury' arising out of one or more of the following offenses: **a.** [f]alse arrest,
detention or imprisonment; **b.** [m]alicious prosecution; **c.** [t]he wrongful eviction
from, wrongful entry into, or invasion of the right of private occupancy of a room,
dwelling or premises that a person occupies by or on behalf of its owner, landlord

- 42 -

or lessor; **d.** [o]ral or written publication, in any manner, of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; **e.** [o]ral or written publication of material, in any manner, that violates a person's right of privacy; **f.** [t]he use of another's advertising idea in your 'advertisement'; **g.** [i]infringing upon another's copyright, trade dress or slogan in your 'advertisment'; or **h.** [d]iscrimination, humiliation, sexual harassment and any violation of civil rights caused by such discrimination, humiliation or sexual harassment."

37.

Owners has no duty to defend or indemnify PSG, McCard, Adams, Perry, or Veitch against the claims set forth in the Underlying Lawsuit because the Underlying Lawsuit does not seek damages for "bodily injury", "property damage", "personal injury", "advertising injury", or "personal and advertising injury" as defined by Policy I or Policy II.

38.

Owners is entitled to a judgment declaring that PSG, McCard, Adams, Perry, or Veitch are afforded no coverage under Policy I or Policy II because the Underlying Lawsuit does not seek damages for "bodily injury", "property

damage", "personal injury", "advertising injury", or "personal and advertising injury"; thus, Owners has no duty to defend or indemnify PSG, McCard, Adams, Perry, or Veitch in the Underlying Lawsuit.

## COUNT II:
## COVERAGE A- NO COVERAGE FOR INTENTIONAL ACTS

39.

Owners repeats and realleges the foregoing paragraphs as if fully set forth herein.

40.

The Underlying Lawsuit alleges that PSG, McCard, Adams, Perry and Veitch engaged in conduct that was "willful, malicious, intentional and calculated."

41.

However, under Coverage A of Policy I and Policy II, the policies only afford coverage to "'bodily injury' and 'property damage' caused by an 'occurrence,'" which is defined as "accident."

42.

Policy I and Policy II also specifically exclude from coverage "bodily injury" and "property damage"… "expected or intended from the standpoint of the insured."

43.

Because PSG, McCard, Adams, Perry, and Veitch engaged in conduct that was "willful, malicious, intentional and calculated", the damages at issue were not caused by an "accident" or "occurrence", and Owners therefore has no duty to defend or indemnify PSG, McCard, Adams, Perry, or Veitch under Coverage A in connection with the Underlying Lawsuit.

44.

Because PSG, McCard, Adams, Perry, and Veitch engaged in conduct that was "willful, malicious, intentional and calculated", the damages at issue were "expected or intended from the standpoint of [PSG, McCard, Adams, Perry, and Veitch]," and Owners therefore has no duty to defend or indemnify PSG, McCard, Adams, Perry, or Veitch under Coverage A in connection with the Underlying Lawsuit.

45.

Owners is, therefore, entitled to a declaratory judgment that it has no duty to defend or indemnify PSG, McCard, Adams, Perry, or Veitch against the Underlying Lawsuit under Coverage A of the policies for these reasons.

### **COUNT III:**
### **COVERAGE B- NO COVERAGE FOR KNOWING VIOLATION OF RIGHTS OF ANOTHER AND MATERIAL PUBLISHED WITH KNOWLEDGE OF FALSITY**

46.

Owners repeats and realleges the foregoing paragraphs as if fully set forth herein.

47.

The Underlying Lawsuit alleges that PSG, McCard, Adams, Perry and Veitch engaged in conduct that was "willful, malicious, intentional and calculated."

48.

Under Coverage B, Policy I does not apply to " 'personal injury' or 'advertising injury'… [c]aused by or at the direction of any insured with the knowledge that the act would violate the rights of another and would inflict

'personal injury' or 'advertising injury' or [e]xpected or intended by the insured…"

49.

Under Coverage B, Policy I does not apply to " 'personal injury' or 'advertising injury' [a]rising out of oral or written publication of material, if done by or at the direction of the insured with knowledge of its falsity."

50.

Under Coverage B, Policy II does not apply to " '[p]ersonal and advertising injury' caused by or at the direction of the insured with the knowledge that the act would violate the rights of another and would inflict 'personal and advertising injury.'"

51.

Under Coverage B, Policy II does not apply to " 'personal and advertising injury' arising out of oral or written publication, in any manner, of material, if done by or at the direction of the insured with knowledge of its falsity."

52.

Because PSG, McCard, Adams, Perry, and Veitch engaged in conduct that was "willful, malicious, intentional and calculated", the damages at issue are

excluded from coverage because these Defendants acted with knowledge that their acts would violate the rights of another and would inflict "personal injury" or "advertising injury" or "personal and advertising injury". In addition, these Defendants published material with knowledge of its falsity.

53.

Owners is, therefore, entitled to a declaratory judgment that it has no duty to defend or indemnify PSG, McCard, Adams, Perry, or Veitch against the Underlying Lawsuit under Coverage B of the policies for these reasons.

**<u>COUNT IV:</u>**
**<u>PSG, MCCARD, ADAMS, PERRY, AND VEITCH</u>**
**<u>ARE NOT INSUREDS UNDER POLICY I</u>**

54.

Owners repeats and realleges the foregoing paragraphs as if fully set forth herein.

55.

Policy I identifies the named insured as "Complete Parts Inc." and identifies "Complete Parts Inc." as a "Corporation."

- 48 -

56.

Policy I does not identify PSG , McCard, Adams, Perry, or Veitch as named insureds.

57.

Policy I does not otherwise insure PSG, McCard, Adams, Perry, or Veitch under Policy I's "WHO IS AN INSURED" provision or any other provision of Policy I.

58.

Consequently, because Policy I insures only Complete Parts, Inc. as a named insured and does not otherwise insure PSG, McCard, Adams, Perry, or Veitch as either named insureds, as insureds under Policy I's "WHO IS AN INSURED" provision, or as insureds under any other provision of Policy I, Owners has no duty to defend or indemnify PSG, McCard, Adams, Perry, or Veitch under Policy I.

59.

Owners is, therefore, entitled to a declaratory judgment that it has no duty to defend or indemnify PSG, McCard, Adams, Perry, or Veitch against the Underlying Lawsuit under Policy I.

## COUNT V:
## MCCARD, ADAMS, PERRY, AND VEITCH ARE
## NOT INSUREDS UNDER POLICY II

### 60.

Owners repeats and realleges the foregoing paragraphs as if fully set forth herein.

### 61.

Policy II identifies the named insured as "Parts South of Georgia, Inc." and identifies "Parts South of Georgia, Inc." as a "Corporation."

### 62.

Policy II does not identify McCard, Adams, Perry, or Veitch as named insureds.

### 63.

Policy II does not otherwise insure McCard, Adams, Perry, or Veitch under Policy II's "WHO IS AN INSURED" provision or any other provision of Policy II.

### 64.

Consequently, because Policy II insures only Parts South of Georgia, Inc. as a named insured and does not otherwise insure McCard, Adams, Perry, or Veitch as either named insureds, as insureds under Policy II's "WHO IS AN INSURED"

provision, or as insureds under any other provision of Policy II, Owners has no duty to defend or indemnify McCard, Adams, Perry, or Veitch under Policy II.

65.

Owners is, therefore, entitled to a declaratory judgment that it has no duty to defend or indemnify McCard, Adams, Perry, or Veitch against the Underlying Lawsuit under Policy II.

**COUNT VI**
**POLICY PERIOD- POLICY II**

66.

Owners repeats and realleges the foregoing paragraphs as if fully set forth herein.

67.

Policy I and Policy II only cover damages or offenses that occur during the policy period.  Moreover, they do not apply to conduct and injury occurring before the policy period begins or where an insured knew of the conduct and injury prior to the policy period.

68.

The claims in the Underlying Lawsuit occurred or began prior to the

inception of Policy II and the insureds knew about those claims. As a result, no

coverage is afforded under Policy II.

69.

Owners is, therefore, entitled to a declaratory judgment that it has no duty to

defend or indemnify McCard, Adams, Perry, or Veitch against the Underlying

Lawsuit under Policy II.

## **COUNT VII**
## **PUBLICATION PRIOR TO POLICY II**

70.

Owners repeats and realleges the foregoing paragraphs as if fully set forth

herein.

71.

Policy II excludes "personal and advertising injury" whose first publication

took place prior to the beginning of the policy period.

72.

The claims asserted in the Underlying Lawsuit are based upon publications

that took place prior to the beginning of Policy II. Thus, the exclusion applies.

- 52 -

73.

Owners is, therefore, entitled to a declaratory judgment that it has no duty to defend or indemnify McCard, Adams, Perry, or Veitch against the Underlying Lawsuit under Policy II.

## **PRAYER FOR RELIEF**

**WHEREFORE,** Owners respectfully prays as follows:

(1) that this Court declare that Owners owes no duty to defend or indemnify PSG, McCard, Adams, Perry, or Veitch in the Underlying Lawsuit;

(2) that judgment be entered in Owners' favor and against all Defendants;

(3) that this Court bind each and every named party herein by said judgment;

(4) that the Court award Owners all costs, expenses, and attorneys' fees that it is entitled to receive under federal and/or state law; and

(5) that this Court enter an order granting such other and further relief as justice requires.

This 28th day of January, 2022.

Respectfully submitted,

KENDALL | MANDELL, LLC


/s/ Michael C. Kendall
Michael C. Kendall
Georgia Bar No. 414030
Michael C. Kendall, II
Georgia Bar No. 510402
*Attorneys for Plaintiff*

3152 Golf Ridge Blvd., Suite 201
Douglasville, Georgia 30135
Telephone:   (770) 577-3559
Facsimile:    (770) 577-8113
mckendall@kendallmandell.com
michaelkendall@kendallmandell.com